## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 06-60633-CIV-MIDDLEBROOKS/JOHNSON

VITAL PHARMACEUTICALS, INC.,
a Florida corporation,

  Plaintiff,

v.

AMERICAN BODY BUILDING PRODUCTS,
LLC, an Illinois Limited Liability Company,

  Defendant.

_____/

## ORDER OF FINAL DISPOSITION

This Cause came before the Court for final disposition during a non-jury trial in West Palm Beach, Florida, from January 8, 2007 through January 12, 2007. The Plaintiff, Vital Pharmaceuticals, Inc. ("VPX"), filed this action against Defendant, American Body Building Products ("ABB"), seeking an injunction and monetary damages for alleged violations of the Lanham Act, 15 U.S.C. §1125(a), and unfair competition pursuant to Florida common law. Plaintiff has offered only limited portions of its bottle, namely its smooth, cylindrical bottle design and neck with vertical lettering of the product name, as its protectable trade dress. Pursuant to Fed. R. Civ. P. 52(a), I make the following findings of fact and conclusions of law.

### I. Facts

Plaintiff VPX is a designer and manufacturer of various nutritional supplement products that are used to support performance in, and recovery from, intense athletic activity. VPX sells its various nutritional supplement products throughout the United States and overseas. John H.

Owoc founded VPX in 1996.  Defendant ABB is a direct competitor of VPX in the nutritional supplement market.

On or about October 2003, VPX began development of a ready-to-drink ("RTD") nutritional supplement beverage, now known as Redline.  In an effort to distinguish its product, VPX, in conjunction with bottle manufacturer CCL Container, Inc., ("CCL"), sought out to design packaging for its product with the hope of distinguishing it from competing brands.

VPX evaluated several proposed designs and prototypes from CCL in its effort to obtain a unique look for its product.  Design efforts led to what VPX refers to as its protected trade dress, namely a bottle design comprising but not limited to the following elements: a cylindrical, seamless body having a bottom central and a top portion.  The central portion comprises the majority of the bottle.  The top portion of the bottle is integral with the central portion and defines an inwardly projecting convexly shaped configuration extending along its longitudinal direction and defines a short, thin neck having an opening for dispensing liquid.  The brand name of the specific product, such as Redline, is displayed vertically along the front of the bottle.  *See* Pl. Complaint at ¶ 18

The aforementioned trade dress is not protected by any federal registration.

VPX's Redline packaging is comprised of a cobalt blue background and also contains red and white coloring.  Plaintiff does not claim the color present on its Redline bottles as part of its trade dress.  The product name, Redline, appears vertically on the bottle.  VPX is not the first or only company to display a product name vertically on a bottle or container with a similar size and diameter.  Plaintiff cites only the vertical lettering, not the specific type of printing or graphics, as part of the trade dress.  The resealable cap on the Redline product, as Mr. Hanson testified, is an

2

industry standard that many drink supplement makers employ, and VPX does not cite the cap as part of its trade dress.

When Plaintiff introduced Redline into the marketplace on or about March or April 2004, the bottle was composed of aluminum and manufactured by CCL Container.  In 2006 VPX switched to a container that is plastic, with a metallic shrink wrap, that is manufactured by a different company, due to the rising costs of aluminum.

The documents and testimony reveal that months before ever being contacted by VPX, the bottle shape was one of several 8 ounce bottle designs created by CCL and distributed to its sales force.  The bottle designs were described by CCL representatives as standard, 8 ounce aluminum cylindrical containers, which could be manufactured with their existing equipment utilizing a 53 millimeter slug.

The bottle designs are virtually identical, with the exception of the tapering at the top to a standard 38 millimeter opening common to the industry.  These designs were intended to utilize the same production line and equipment and, according to CCL, while the height of the bottle and angle of tapering could be changed slightly, a cylindrical, 8 ounce bottle on a 53 millimeter base does not afford many parameters for change.

In the development of the Redline bottle, VPX asked CCL container about available bottle designs to accommodate an 8 ounce beverage.  CCL sent VPX samples and a concept drawing in response to the request.  VPX's graphics department overlayed its design for the bottle on one of the pre-existing bottle samples provided by CCL.  The size and shape of the bottle that became Redline was not VPX's design, rather CCL had the existing design, and VPX put its own graphics onto CCL's pre-existing bottle design.  CCL representatives categorically stated that the bottle

shape was not designed for VPX, and it was not offered to them exclusively. Nor could it be, as CCL marketed the 8 ounce bottle to other manufacturers prior to and after the time that VPX selected the bottle for Redline.

Mr. Goda, CCL's vice president of new product and market development, stated that VPX was interested in its standard 8 ounce bottle design because there would be no additional costs for tooling. ("[VPX] wanted something that [VPX] didn't have to invest tooling in. That's why you see the Trimlines and the ovals. They were standard tool packages for us. So if he would choose something that we already had available, then they could basically enter the market without paying tooling charges for something special").

Mr. Spohr, a CCL marketing director and sales manager, described the bottle used by VPX as a standard container available to anyone who might request it for use in holding a beverage or other liquid product. CCL would not have been willing to enter into an exclusive arrangement with one manufacturer for use of its 8 ounce bottle, as it had already offered the product to so many other companies. (Spohr: "this is a general specification for containers manufactured available for sale to any prospect").

I find the statements by the CCL officials to be convincing and credible, and it leads to the conclusion that CCL's 8 ounce bottle design is neither unique or inherently distinct. I find that if a company wanted an 8 ounce bottle with rounded shoulder, there were only a limited number of designs that were feasible. Additionally, an 8 ounce bottle with a standard, 53 millimeter base will also lead to a limited number of possible shapes. Widening the base beyond 53 millimeters, if a producer intended to keep an 8 ounce bottle, would lead to an awkwardly short, squat design. Similarly, narrowing the base diameter would necessarily result in an unusually tall and narrow 8

ounce bottle. (Goda: "the eight ounce bottle......you certainly wouldn't see a 66 millimeter diameter, and I'm not sure that we could do that in 59.....as the fluid capacity reduces it really forces us into a smaller container diameter. So the 53 millimeter would be the most appropriate for an 8 ounce package"). It is clear that a company would suffer a competitive disadvantage if it could only offer an 8 ounce RTD product in these awkward forms with non-standard base diameters.

The smooth, cylindrical bottle that VPX claims as part of its trade dress is a standard design that CCL offers to various product manufacturers. There is nothing unique about a smooth, cylindrical bottle shape, as this form of container has existed for years. Any company is free to contact CCL and purchase their 8 ounce aluminum slug design for use in holding a beverage. Prior to VPX's introduction of Redline in the CCL-made container, Defendant ABB manufactured its own line of ready to drink sports supplement products. ABB did not offer any of its products in an 8-fluid ounce container prior to VPX's introduction of Redline in an 8-fluid ounce container. ABB's ready to drink products were often sold in a "finger grips" shaped plastic container, or a pop top soda can.

In 2003 ABB began working on developing a formulation for a RTD product, and it considered a product size of between 7 and 10 ounces. In November 2003 Mr. Michihara, ABB's Director of Marketing, communicated with Ken Sarley, ABB's South Carolina Plant Manager, regarding the technical parameters of machinery at the plant required to run and fill an 8 ounce container. He also inquired as to the possibility of manufacturing a cardboard carrying case for the potential product. At this time, VPX's Redline product was not on the market.

For ABB's machinery to run and fill bottles of any product, the neck ring must be 38

5

millimeters, as that is the measurement compatible with its existing equipment. ABB's other existing beverages with a resealable cap are also 38 millimeters, so as to comply with its filling machinery. Sarley also stated that the cap used on the Speed Shot bottle is purchased from a third party, and that the cap is an industry standard and widely available. The transfer ring, or neck ring, on the Speed Shot bottle, which is not present on the Redline bottle, is necessary for ABB to fill bottles with its existing equipment.

In looking for a bottle for the product that became Speed Shot, ABB sought designs from a Chinese company and from CCL container. The Chinese bottle prototypes, while not ultimately used by ABB, were also described by its agent as "standard" or "stock," and they were of a very similar shape and size to the CCL bottle that ABB chose for Speed Shot. When ABB met with CCL about potential bottle types for Speed Shot, CCL referred to its 8 ounce bottle as "a stock 38 millimeter slug bottle."

Mr. Spohr, rather than an ABB employee, advised ABB to utilize a smooth-shaped bottle, rather than one with ridges or finger grips, to reduce tooling costs and more readily accommodate text and graphics on the bottle surface. ("any organization tries....to sell what is commonly manufactured, and our attempt would be to have commonality of containers to minimize changeovers"). ABB did not deliberately seek out VPX's exact bottle design, rather they chose what CCL provided to them as *its* standard, 8 ounce bottle design. (Spohr: "our desire was to sell them the standard bottle").

Additionally, ABB inquired with InnerWorkings, its consultant during the search for an 8 ounce bottle, whether it would be possible to design a bottle with ridges or finger grips. The consultant's representative, Mr. Gabaldon, informed ABB that it would be "cost prohibitive."

("This is kind of a stock bottle in the industry, it's very easy to stamp this out").

In or about April 2006, ABB began selling its Speed Shot RTD product in an 8-fluid ounce container similar to the container VPX utilizes for its Redline product. ABB's Speed Shot bottle is silver and gray in color. ABB's bottle packaging displays three registered trademarks owned by ABB: 1) ABB, Registration No. 2,811,132 for "dietary supplements in the form of ready to eat food bars, powdered drink mixes and liquid drinks" 2) the ABB eagle design mark, Registration No. 2,628,224 for "dietary supplements in the form of liquid drinks and ready to eat protein based food bars" and 3) Speed Shot, Registration No. 3,140,153 for "sport drinks."

The product name, Speed Shot, appears vertically on the bottle. ABB chose to put the product's name vertically in order to allow potential purchasers to see the entire name. When the Speed Shot and Redline products sit on a store shelf or in a cooler, it is nearly impossible to see the entire product name without employing vertical lettering. With horizontal lettering on an 8 ounce bottle, a consumer would have to pick up and rotate the bottle in order to view the entire product name. Forcing a company to use only horizontal lettering on an 8 ounce bottle would result in a competitive disadvantage.

The ABB eagle design trademark is well-known and appears on all of ABB's products. This trademark appears on both the body of the Speed Shot bottle and on the top of the product's twist-off cap. The mark is plainly visible to the consumer, as evidenced by the testimony of Plaintiff's witness Gene Bukovi. Mr. Bukovi initially selected a Speed Shot bottle in a store, when the store was out of Redline, with the thought that it was a VPX product. Prior to purchasing the product, however, Mr. Bukovi noticed the eagle emblem and knew that ABB manufactured Speed Shot. He decided to purchase the product despite this knowledge.

7

Mr. Bukovi also testified that he is a discerning purchaser of RTD and other body building products. He stated that he closely looked at the label of Speed Shot before he purchased it, as he wanted to ensure that it did not contain carbohydrates or many calories. Purchasers of RTD beverage products are a highly discerning group of consumers.

Plaintiff's witness Mr. Hanson was also easily able to identify Speed Shot as an ABB product upon viewing the eagle emblem, which he recognized from his position in the industry. Hanson's only confusion about Speed Shot's origin was when he viewed the product in another person's hand from across a gym.

Plaintiff did not offer any survey evidence indicating that either Redline itself, and particularly its limited depiction of its trade dress, has attained a secondary meaning among consumers. Defendant offered a survey done by Dr. Cowan, and this survey indicated that Redline had not obtained secondary meaning among consumers. His survey results indicated that there is no reasonable basis by which to claim a likelihood of confusion exists between the Redline and Speed Shot trade dress.

VPX has advertised its Redline product in various advertising media, but many of these advertisements do not feature the trade dress itself, or they feature the trade dress in combination with other VPX products. Several of the Plaintiff's ads submitted into evidence feature Redline in pill form, and these pills are in a bottle drastically different from VPX's claimed trade dress. Other ads submitted in evidence focus on a scantily clothed, muscular woman, with the claimed trade dress appearing in a small form in the bottom, right corner. Here again the claimed trade dress is side by side with the product in pill form. Still other ads draw the eye to a prominently displayed sports car, and Redline appears in two different bottle containers, along with a packet-

8

shape container. Finally, there is also no evidence that the Redline trade dress has received any unsolicited media coverage.[1]

## II. Legal Analysis

In this case Plaintiff alleges that Defendant has violated its rights under Section 43 (a) of the Lanham Act, 15 U.S.C. § 1125. The relevant portion of the statute reads as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

In order to prevail on a claim for trade dress infringement pursuant to this statute, a Plaintiff must prove by a preponderance of the evidence that (1) the trade dress of the two products is confusingly similar; (2) that the features of the trade dress are primarily nonfunctional; and (3) that the trade dress is inherently distinctive or has acquired secondary meaning. *See Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996). As all three elements are necessary for a finding of trade dress infringement, any one could be characterized as a threshold. *See Id.* at 1039.

---

[1] Plaintiff consistently directed me to the fact that VPX's Redline bottle received the Ameristar award, a distinction in the packaging industry. I note, however, that CCL itself received the award, not Plaintiff, and it was the result of technological advances of the bottle itself, rather than Plaintiff's trade dress. The award is therefore no indication of uniqueness of the trade dress.

I shall apply the same legal analysis and standards for Plaintiff's unfair competition claim pursuant to Florida law, as the analysis under the Lanham Act for trademark infringement also applies to claims of trademark infringement and unfair competition under Florida common law. *See Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1264 (S.D. Fla. 1999), *citing Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1475 (11th Cir. 1991).

Regarding Plaintiff's trade dress infringement claim, I find that VPX has failed to meet its burden as to all three elements of the Eleventh Circuit's test. I will analyze each of the elements in turn.

### A. Inherently Distinctive/Secondary Meaning Prong

VPX's claimed trade dress is not inherently distinctive, nor has it acquired secondary meaning. In assessing inherent distinctiveness, the Eleventh Circuit has held that district courts should examine

> the trade dress and consider, among other factors: whether it [is] a "common" basic shape or design, whether it [is] unique or unusual in a particular field, [and] whether it [is] a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods.

*AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1536 (11th Cir. 1986).

It is "the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness." *Carillon Importers v. Frank Pesce Group*, 913 F. Supp. 1559, 1563 (S.D. Fla. 1996).

Certainly, an 8 ounce, cylindrical bottle shape constitutes a "common" basic shape or

design, as there is nothing inherently unique about a cylindrical, geometric form. Indeed, "ordinary geometric shapes . . . . are regarded as non-distinctive." *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 858 (11th Cir. 1983).[2] CCL's corporate representatives were unequivocal in stating that their 8 ounce bottle is not unique but rather a common bottle form.

There is not sufficient evidence to find that the overall appearance of the Plaintiff's trade dress is unique or unusual. Mr. Hanson testified that the bottle's appearance was new in the industry, as he was not aware of any other competing product in a similar container. However, being first in time to have a particular design appearance does not mandate a finding of distinctiveness.

In support of its argument for inherent distinctiveness, Plaintiff cites to the *Ambrit* case, where the Eleventh Circuit held that the wrapper for "Klondike" ice cream bars was inherently distinctive. The court noted that "the Klondike wrapper with its square size, bright coloring, pebbled texture, polar bear and sunburst images, and distinctive style of printing is a complex composite of size, color, texture and graphics. . . . [creating] a distinctive visual impression." *AmBrit, Inc.*, 812 F.2d at 1536. Both wrappers in that case contained a polar bear as the most prominent feature of the wrapper.

Unlike *Ambrit*, however, Plaintiff in this case does not even claim the shininess of its bottle, the color, images, or particular print type of graphics as part of its trade dress. The court in *Ambrit* found the Klondike bar trade dress to be distinctive, but I note that the Eleventh Circuit

---

[2] The Court notes that the Trademark Trial and Appeal Board (TTAB) has found that cylindrical tubes are the antithesis of distinctive. "A cylindrical tube is the antithesis of a distinctive shape for tubes that have been used from ancient times until the present as receptacles. Hundreds of items are packaged in cylindrical tubes in the nature of cans and the like." *In re International Playtex Corp.*, 155 USPQ 745, 746 (T.T.A.B. 1967).

did not end its analysis with a finding of inherent distinctiveness. The court went on to say that

> ... latecomers were free to use the same colors or the same design as
> long as their trade dress did not convey the same visual impression.
> In the same vein, latecomers in the five ounce chocolate-covered ice
> cream bar market may use certain elements of the Klondike trade dress
> as long as their use does not convey the same visual impression.

*Id.* at 1537.

Suffice to say that the inherent distinctiveness found in *Ambrit* is easily distinguishable from the present case, as Plaintiff's Redline trade dress does not have the same "complex composite of size, color, texture and graphics" as that present in the Klondike bar trade dress. Plaintiff is asking me to find that a smooth, cylindrical container with a neck and vertical lettering is inherently distinctive. I am unpersuaded, and for purposes of this first prong of the test, find that VPX's trade dress is not inherently distinctive.

Additionally, I find that Plaintiff's trade dress has not acquired a secondary meaning in the RTD marketplace. The term "secondary meaning" denotes that consumers have formed an association in their minds between the trade dress and the source or origin of the product. *See Id.* at 1536, n.4.

Appeals courts have held that survey evidence "is the most direct and persuasive evidence" to establish secondary meaning. *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999). VPX presented no survey evidence at trial indicating that its Redline product had acquired secondary meaning in the minds of consumers. ABB, on the other hand, provided Dr. Cowan's survey, and this survey indicated that Redline had not attained secondary meaning. While survey evidence is not required to prove secondary meaning, the fact that Plaintiff did not

12

offer its own survey when faced with ABB's survey evidence mitigates against any finding that secondary meaning exists.

Other factors to consider in analyzing secondary meaning include (1) the length and manner of use; (2) the nature and extent of advertising and promotion; (3) the efforts made by plaintiff to promote a conscious connection with the public's mind between the name and plaintiff's product; and (4) the extent to which the public actually identifies the name with plaintiff's product. *See Popular Bank v. Banco Popular*, 9 F. Supp. 2d 1347, 1357 (S.D. Fla. 1998).

Here VPX introduced Redline in the Spring of 2004. No other RTD product had a nearly identically shaped container during this time. VPX also extensively advertised its Redline product, spending over 2 million dollars to advertise the product in various media, including an ad in New York's Times Square over New Year's. However, the dispositive factor is not the extent of the promotional efforts, but their effectiveness. *See Brooks Shoe Mfg. Co.,* 716 F.2d at 860. As noted, many of VPX's ads for Redline either did not feature the trade dress or featured it in combination with other containers for the very same Redline product.

Therefore, VPX must provide other evidence, in addition to advertising, that indicates a secondary meaning among the consuming public. It has failed to do this. Plaintiff's other evidence of secondary meaning was the testimony of Mr. Bukovi and Mr. Hanson. Mr. Bukovi, a body builder and friend of Mr. Owoc, stated that he viewed the 8 ounce Redline bottle as indicating a VPX product. Mr. Hanson testified in the same manner. I cannot accept the testimony of only two individuals as sufficient evidence of secondary meaning. With no survey evidence, I am left with these two witnesses, VPX's advertising campaign for Redline that does

13

not always prominently feature the trade dress itself, and the fact that Plaintiff was the first company to offer an RTD product in a seamless, cylindrical, 8 ounce bottle.

The First Circuit has rejected a claim of secondary meaning in a case with similar facts, *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366 (1st Cir. 1980). There the plaintiff sold soda crackers in a green cylindrical can, which Keebler has used continuously since the mid-1930's in merchandising its crackers. The defendant packaged its crackers in a similar cylindrical lithographed can. The court rejected a claim of secondary meaning.

> Absent proof of secondary meaning more substantial than 'exclusive use for several years', Keebler cannot prevail in asserting that its prosaic cylindrical shape had acquired a secondary meaning. Were this not our holding, the first user of a container such as the now-standard soup can, potato chip bag, or cracker box would be able to preclude competitors from using these highly functional containers.

*Id.* at 378.

I agree with the First Circuit's analysis in this case. VPX has failed to provide enough evidence to convince me that its product has acquired secondary meaning. Simply because VPX was the first RTD market participant to use a smooth, cylindrical, 8 ounce can, it cannot then exclude other competitors from using this container for a never-ending timeframe. Holding otherwise would lead to absurd, anti-competitive results. Soda makers such as Coca-Cola were at one time the first to sell soda in 12 ounce soda cans, yet a simple walk through the grocery store reveals that no court ever granted them an exclusive right to a smooth, cylindrical, 12 ounce soda can with vertical lettering. While my finding of a lack of inherent distinctiveness and secondary meaning is fatal to Plaintiff's claim, I will analyze the next two elements of the trade dress test, as VPX has fallen far short of proving those elements as well.

14

**B. Functionality Prong**

"Trade dress is protectible under section 43(a) only if it is primarily nonfunctional."

*AmBrit, Inc.*, 812 F.2d at 1538.  I find that VPX has failed to prove by a preponderance of the

evidence that its trade dress is primarily nonfunctional.

"Functional features are by definition those likely to be shared by different producers of

the same product and therefore are unlikely to identify a particular producer." *Dippin' Dots, Inc.*

*v. Frosty Bites Distrib.*, LLC, 369 F.3d 1197, 1203 (11th Cir. 2004).  "These features cannot be

appropriated; otherwise, competitors would be prevented from duplicating the new product even

to the extent permitted by the branches of the law of intellectual property that protect innovation

rather than designations of source."  *Id.*

The Eleventh Circuit has noted that the line between functionality and non-functionality is

not brightly drawn.  *See Id., citing Epic Metals*, 99 F.3d at 1039.  However, this Circuit has laid

out two tests for determining functionality.

> Under the first test, commonly referred to as the traditional test, a product
> feature is functional if it is essential to the use or purpose of the article or
> if it affects the cost or quality of the article. Under the second test, which
> is commonly called the competitive necessity test and generally applied in
> cases of aesthetic functionality, a functional feature is one the exclusive use
> of which would put competitors at a significant non-reputation-related
> disadvantage. Where the design is functional under the traditional test, there
> is no need to proceed further to consider if there is a competitive necessity
> for the feature.

*Dippin' Dots, Inc.*, 369 F.3d at 1203.

To determine the issue of functionality, the court reviews each element of the trade dress

as a whole.  *See Id.*  Therefore, the inquiry is an overall examination of the Plaintiff's bottle shape,

the bottle neck, and the vertical lettering.  Upon examination, I find that Plaintiff's trade dress fails

15

the Eleventh Circuit's functionality test.

Plaintiff's inclusion of vertical lettering in its trade dress is central to my finding that the dress fails the competitive necessity test. VPX cannot claim that it has an exclusive right to market RTD products in an 8 ounce container. An 8 ounce bottle is comparatively small, regardless of the exact design dimensions. On a bottle of this size, vertical lettering of the product's name is the only way for a consumer to see the name from a single angle, rather than by rotating the product. Based upon the manner that beverage products are shelved, in many cases it would not be possible to see an entire product name if the lettering was horizontal. Vertical lettering allows for consumers to identify a product on a shelf in a small-sized container, and it is a functional feature. Were I to hold that only the Plaintiff was allowed to market its product in 8 ounce containers with vertical lettering, it would put competitors at a significant non-reputation-related disadvantage.

Other federal courts have held that the placement of a product's name to ensure visibility is a purely functional feature. *See Walt Disney Co. v. Goodtimes Home Video Corp.*, 830 F. Supp. 762, 769 (S.D.N.Y. 1993). The functionality of vertical lettering is evident in the fact that multiple other manufacturers in the beverage industry employ it. Allowing VPX to monopolize this lettering arrangement on 8 ounce bottles would put all competitors, not just the Defendant, at a significant commercial disadvantage. To ensure visibility, there was no other way to put ABB's product name on the bottle other than in vertical form

Plaintiff argues that its design is non-functional, directing me to *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6 (7th Cir. 1992) ("*Abbott Labs* "). VPX claims that in *Abbott Labs*, the Seventh Circuit held that a clear plastic bottle containing the product Pedialyte was non-

16

functional. However, this case does not stand for the proposition that Plaintiff asserts. In that case, the Seventh Circuit merely remanded the case, where the district court had made a finding of functionality of the subject bottle. *See Id.* The appeals court did not make its own finding as to the functionality of the Pedialyte bottle, it merely directed the district court to examine all the factors required in a functionality analysis, something that had not occurred. "We believe that the district court's conclusion constitutes an abuse of discretion because the court did not address all of the issues essential to a comprehensive examination of functionality." *Id.* at 21.

Plaintiff next directs me to the decision of a sister court, and its finding that a vodka bottle was non-functional. *See Carillon Importers v. Frank Pesce Group,* 913 F. Supp. 1559 (S.D. Fla. 1996). That case is also distinguishable from the case at bar.

In that case, Judge Hurley discussed the vodka bottle's functionality as follows:

> In the Eleventh Circuit, a bottle with a neck on it would probably not constitute protected trade dress because a neck is a functional requirement on a bottle, or at least a competitive necessity. In contrast, a bottle with a swan shaped neck on it would be protectable because of the non-functional whimsy of its neck design. Although, the Stolichnaya Cristall bottle alone is quintessentially functional in its common, wine bottle shape, the combination of elements comprising Stolichnaya Cristall's trade dress is not merely functional. Among all the bottle shapes, labels, and color schemes available to a producer distributor, the selection of a narrow, clear glass, Russian wine bottle, sealed in black neck wrapping and labeled in black with white, gold, and red lettering, is decidedly non-functional.

*Id.* at 1564.

The Plaintiff in *Carillon* claimed the coloring of its labels and design as part of its trade dress, unlike the present case. Clearly, the color and labeling scheme present on the vodka bottle was a determinative issue in the case. Without the color schemes, the Plaintiff would have been

17

left with a bottle that Judge Hurley described as "quintessentially functional."

I have already found that VPX's use of vertical lettering is a functional feature. Similarly, since the Plaintiff herein does not claim the color of its product as its trade dress, VPX is left with nothing more than the smooth, cylindrical bottle and accompanying neck. The Carillon Court pointed out that the neck of a bottle is a functional feature, and I agree with that conclusion. *See Id.* A bottle neck, absent a whimsical, non-functional design such as the swan neck cited in *Carillon*, is simply a functional feature for the dispensing of liquid. Additionally, the 38 millimeter neck was not unique to VPX's Redline product at the time of its entry, as the Defendant has used that neck in products it introduced prior to the existence of VPX.

It is clear to me that VPX's claimed trade dress is primarily functional. When I view the trade dress features as a whole, the overall impression is one of functionality. The vertical lettering allows for consumers to easily see the product, and placement for visibility is clearly a functional feature. The neck of the bottle is also functional.

After examining those two features, the only remaining part of the trade dress is the smooth cylindrical central body of the bottle. I do not need to make a functionality determination as to this last element of the trade dress, because even if this element was found to be non-functional, the trade dress overall would still be primarily functional. Therefore, Plaintiff's claim fails the Eleventh Circuit's functionality test.

### C. The Likelihood of Confusion Prong

VPX failed to prove by a preponderance of the evidence that ABB's Speed Shot product is confusingly similar to Plaintiff's Redline product.

"The touchstone test for a violation of § 43(a) is the likelihood of confusion resulting from

18

the defendant's adoption of a trade dress similar to the plaintiffs." *Ambrit, Inc.*, 812 F.2d at 1538

> In determining whether a likelihood of confusion exists, the fact finder evaluates a number of elements including [the following seven factors]: the strength of the trade dress, the similarity of design, the similarity of the product, the similarity of retail outlets and purchasers, the similarity of advertising media used, the defendant's intent, and actual confusion. The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision. The appropriate weight to be given to each of these factors varies with the circumstances of the case.

*Id.*

The "extent to which two marks are confusingly similar cannot be assessed without considering all seven factors to ensure that the determination is made in light of the totality of the circumstances." *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488-89 (11th Cir. 1987).

As to the first factor, the strength of an individual trade dress determines the scope of protection it will receive: strong trade dress receives strong protection, and weak trade dress receives weak protection. *See Ambrit*, 812 F.2d at 1539. The strength of a particular trade dress is determined by a number of factors that establish its standing in the marketplace. *See Id.* The appropriate degree of protection is determined by examining a number of factors that establish the standing of the trade dress in the marketplace: most notably, the type of trade dress and the extent of the third party uses. *See Id.*

In analyzing the scope of protection a particular trade dress warrants, a court must first consider the type of trade dress involved. *See Id.* Trade dress may be classified as generic, descriptive, suggestive, or arbitrary, and the scope of protection increases as the trade dress

moves toward the arbitrary end of the spectrum.  *See Id.*

> Generic marks refer to a particular genus or class of which an individual
> service [or product] is but a member; such marks may never receive . . .
> protection. Descriptive marks directly describe a characteristic or quality
> of the service [or product], and can only be protected if they have acquired
> "secondary meaning." "Vision Center," when used to describe a place to
> purchase eyeglasses, would be a descriptive name. Suggestive marks subtly
> connote something about the service [or product] so that a consumer could
> use his or her imagination and determine the nature of the service
> [or product]. The term "Penguin" would be suggestive of refrigerators.
> . . . An arbitrary or fanciful mark is a word in common usage applied to a
> service [or product] unrelated to its meaning; "Sun Bank" is such an
> arbitrary or fanciful mark when applied to banking services.

*Id.* at 1537.

I find that VPX's trade dress in this case is simply generic and deserving of little or no

protection.  VPX's claimed trade dress is not descriptive or suggestive, as it is not similar to the

ice cream bar trade dress that the Eleventh Circuit analyzed in *Ambrit*.  There the court reviewed

the level of protection given to "Klondike Bar" ice cream bars.  The court described the trade

dress as follows:

> (The bars are) wrapped in pebbled foil presenting a 3 X 3 inch silver
> panel featuring a white polar bear on all fours before a sunburst design.
> Both the polar bear and the sunburst are outlined and highlighted with
> royal blue.  Below the bear is the word "Klondike", written in large white
> letters outlined in royal blue. "Isaly's" appears in small blue letters to the
> right of the bear...

*Id.* at 1533.

The bars in that case also had the exact same shape. *See Id.*  However, as noted in the

discussion of inherent distinctiveness, VPX's trade dress is far less complex than the Klondike bar

in *Ambrit*.  There is no polar bear suggesting coldness, or an image of a weightlifter, which could

be suggestive of a fitness product.  The product name, Redline, is not even descriptive of the

20

product itself. Finally, there is nothing arbitrary of fanciful about Plaintiff's bottle. It is a commonly manufactured and marketed 8 ounce, cylindrical bottle that has been in existence since at least the year 2000.

The second factor in the "likelihood of confusion" prong is the similarity of design. Here, the Redline and Speed Shot bottles, when viewed in their entirety, are moderately similar. Certainly, the size and shape of the bottles are similar. However, the labels and colors employed on the bottles are starkly different, and this difference serves to significantly reduce any potential confusion. While both products have vertical lettering, ABB has added their trademark eagle emblem to the Speed Shot bottle and cap, along with using a different color scheme.

"The presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question is highly relevant to an inquiry concerning the similarity of the two dresses. When prominently displayed it can go far towards eliminating any possible confusion." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992).

Additionally, I find persuasive the Second Circuit's statement in *Nora Beverages v. Perrier Group*, where the court stated "Labels can be integral, if not dispositive, factors in determining overall similarity of trade dress." 269 F.3d 114, 122 (2d Cir. 2001). The court went on to state that "the presence of the prominent and distinctive labels alone negates any possibility of a likelihood of confusion and provides sufficient basis for affirming the district court's grant of summary judgment." *Id.* at 123. Here, as in that case, the presence of two distinct labels negates any likelihood of confusion.

The prominent eagle marking and labeling on Defendant's bottle serves to drastically

reduce the likelihood of any possible confusion. In fact, one of the Plaintiff's own witnesses, Mr. Bukovi, testified that while he initially picked up a Speed Shot bottle thinking that it was a VPX product, he realized that it was an ABB product before he purchased by looking at the eagle emblem on the bottle. This testimony serves to dispel the argument that there exists a likelihood of confusion between the two products.

The Eleventh Circuit mandates that this Court look at the similarity of design "in the context of the trade dress as a whole." *AmBrit, Inc.*, 812 F.2d at 1540. Here there are two bottles of nearly identical size and shape. However, the color scheme of the two is substantially different, and the ABB eagle emblem is prominently displayed. These features, taken in the whole, lead me to conclude that there exists only a moderate level of similarity between the two designs.

The third factor to consider is the similarity of the product. Both products are RTD beverages meant to be consumed before a work out. While the Redline bottle also contains connotations about fat burning, it is clear that the products are similar and are meant to serve similar purposes. However, while the products are similar, the level of similarity is not dispositive as to the analysis of potential confusion.

The fourth factor to consider is the similarity of retail outlets and purchasers for the two products. VPX and ABB both sell their respective products through distributors who, in turn, sell the product to retailers in the nutrition and supplement industry and gyms. Plaintiff also sends its product to stores where Defendant does not. For example, Mr. Hanson testified that Wal-Mart is the largest seller of Redline, and Defendant does not market its product there.

Mr. Owoc also testified that VPX now markets its product in stores such as 7-Eleven, referring to them as the fitness and health stores of the future. ABB does not sell its product in

this store.  Furthermore, Plaintiff markets its product as a fat burner to individuals who are not

necessarily body builders.  This is a broader class of consumers, as Defendant markets almost

completely to body builders and serious fitness enthusiasts.  So while there is some similarity in

retail outlets and purchasers, it is not compelling.

Fifth, I must examine the similarity of advertising media the parties employ.  Here the

Defendant does not dispute the fact that the advertising media employed by the parties is very

similar, including use of the same fitness magazines.

The sixth factor in the analysis is the Defendant's intent.  Mr. Michihara of ABB testified

that he conceived of a "shot" drink in mid to late 2003, a time that preceded VPX's introduction

of Redline into the market.  Additionally, ABB has placed its eagle emblem trademark in two

locations on the Speed Shot bottle, and this placement weakens any argument that ABB was

attempting to fool consumers into thinking that VPX was the producer of Speed Shot.

It is clear that there was no intent to confuse consumers as to the origin of the Speed Shot

product.  Furthermore, public policy favors allowing companies to imitate the products of their

competitors.  As the Eleventh Circuit noted in *Epic Metals,* "It is plainly obvious that Condec

copied Epic's product.  However, public policy favors competition by all fair means, and that

encompasses the right to copy, very broadly interpreted, except where copying is lawfully

prevented by a copyright or patent ... ." *Epic Metals,* 99 F.3d at 1042.

Additionally, the Supreme Court has also noted the limits on trade dress protection, even

in circumstances where one company has imitated another's product.

> Trade dress protection must subsist with the recognition that in many
> instances there is no prohibition against copying goods and products.
> In general, unless an intellectual property right such as a patent or

23

> copyright protects an item, it will be subject to copying. As the Court
> has explained, copying is not always discouraged or disfavored by the
> laws which preserve our competitive economy.

*Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 29 (U.S. 2001).

I find that ABB did not have the intent to confuse consumers as to the maker or origin of

the product. Plaintiff presented evidence, including the testimony of Mr. Owoc, indicating that it

would have been very cheap and easy for ABB to retool the design of its bottle so as to avoid

even the initial appearance of confusion. While I find an absence of confusion under the current

appearance of the bottles, it must be noted that requiring the Defendant to retool its product in

order to avoid *any* potential for confusion would be an extremely anti-competitive practice. The

law allows for copying, as long as there is no likelihood of confusion. Just as Coke, assuming it

was the first soda maker to sell soda in 12 ounce cans, cannot force Pepsi to retool its can to a

different size and appearance, VPX cannot require ABB to retool its bottle when no likelihood of

confusion exists, even if the cost is not significant.

The final element to the likelihood of confusion analysis is any evidence of actual

confusion. Plaintiff presented the testimony of Mr. Bukovic, a body builder and colleague of Mr.

Owoc, wherein he stated that he selected a bottle of Speed Shot with the initial impression that it

was VPX product. However, as noted, Mr. Bukovic realized that Speed Shot was an ABB

product before he purchased it by looking at the ABB eagle emblem on the bottle itself. This is

hardly ample evidence for a finding of actual confusion.

VPX also offered the testimony of Kris Hanson, another individual with experience in the

sports supplement industry, who stated that he saw people drinking Speed Shot and due to the

shape of the bottle, he believed it to be a new VPX product. Mr. Hanson also testified, however,

that upon looking at the bottle more closely, he determined that it was in fact not a VPX product.

Plaintiff directs me to several cases that have held that "initial interest confusion," such as that present with Hanson and Bukovic, is sufficient to find a likelihood of confusion. *See Jordache Enterprises, Inc. v. Levi Strauss & Co.,* 841 F.Supp. 506, 514-515 (S.D.N.Y. 1993); *see also Foxworthy v. Custom Tees, Inc.,* 879 F.Supp. 1200, 1215-1216 (N.D. Ga. 1995). The Eleventh Circuit has not embraced this principle, and I find it unpersuasive. When the bottom line is sales of a particular product, initial confusion prior to and concluding before the point of purchase does not seem dispositive in a likelihood of confusion analysis.

Finally, VPX offered into evidence photographs of the Redline product stocked, in some instances, side by side with Speed Shot in various commercial outlets. This evidence, however, is not particularly probative on the issue of confusion. Products of similar size and type are nearly always shelved together in stores, yet there is no likelihood of confusion. Again, the attempt to prove confusion fails in the face of ABB's labeling of its product with the eagle emblem. The only way consumers could possibly be confused as to the origin of Speed Shot would be if they saw the product from a distance and did not examine it up close. If a consumer is close enough to grasp the product for the purpose of purchasing it, ABB's trademark emblems would be clearly visible, and they would alert the consumer as to the product's manufacturer.

Upon examining and weighing the seven factors necessary for a determination of likelihood of confusion in the Eleventh Circuit, I find that Plaintiff has failed to prove by a preponderance of the evidence that a likelihood of confusion exists. The most compelling reasons for this finding are that ABB clearly labels Speed Shot with its trademark eagle emblem on both the bottle and cap, thereby negating any finding of intent or actual confusion. VPX's limited

25

evidence of actual confusion is not sufficient to rebut this finding.

This conclusion is supported by the fact that the vast majority of purchasers of RTD

products are serious fitness enthusiasts who are discerning purchasers.  Here a portion of the

Eleventh Circuit's decision in *Dippin Dots* is instructive.

> a court may not view trade dress in a vacuum. Rather, a court must
> consider how the trade dress would function in the actual market place.
> Ice cream novelties are impulse items . . . sold . . . to hurried shoppers.
> When viewed in this context, the general similarity of the design of the
> trade dress of the two products is a[] . . . strong[] indication of the
> existence of likelihood of confusion.

*Dippin' Dots, Inc.*, 369 F.3d at 1208.

Unlike ice cream novelties, RTD beverages are definitely not impulse purchases.  Here

there are not eager children running up and grabbing the first product that they see.  In contrast,

Mr. Bukovi testified that he is such a discerning purchaser of RTD products that he examines the

nutritional information to make sure that the product he is buying does not contain carbohydrates.

It is clear that when looking at the two products in the marketplace, the vast differences in color

and the presence of ABB's trademark, in combination with discerning purchasers, serve to dispel

any likelihood of confusion.

I find that Plaintiff's unfair competition claim also fails, as the legal analysis of that claim is

the same as that employed for trade dress claims.  *See Carnival Corp.*, 74 F. Supp. 2d at 1264.

Having found that Plaintiff's claims do not meet the Eleventh Circuit's test for a trade dress claim,

the unfair competition claim must also fail.

## III. Conclusion

The notion that a company can appropriate a standard, 8 ounce bottle, utilize vertical lettering of its product name, and preclude competitors from using that bottle with their own vertical lettering, without regard to product name, mark, graphics, or color scheme is unsupported by the Lanham Act and is without substance. It seems to be nothing but a thinly-veiled effort to stifle legitimate competition, competition that is legal under the law.

I reserve ruling on Defendant's request for attorney's fees pursuant to § 1117. The Defendant asks that attorney's fees be charged against VPX, stating that there are exceptional circumstances pursuant to the statute, and pointing to factors that may support such a conclusion. Additional briefing would be helpful to a determination of the standard to be applied in determining whether exceptional circumstances exist, and whether these facts justify such a finding. I direct the parties to contrasting cases from the Eleventh Circuit and the DC Circuit as a starting point, as each case employed a different standard. *See Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160 (11th Cir. 1982); *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 248 U.S. App. D.C. 329 (D.C. Cir. 1985).

Accordingly, it is

ORDERED AND ADJUDGED that judgment is entered in favor of Defendant on all of Plaintiff's claims. Defendant shall file with the Court a brief addressing the award of attorney's fees within ten (10) days of the date of this Order. Once Defendant files its brief, Plaintiff shall have ten (10) days to respond. Defendant may then file a reply within five (5) days of receipt of Plaintiff's response.

27

DONE AND ORDERED in West Palm Beach, FL, this 12th day of January 2007.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

copies to counsel of record