UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-60633-CIV-MIDDLEBROOKS/JOHNSON

VITAL PHARMACEUTICALS, INC.,
a Florida corporation,

    Plaintiff,

v.

AMERICAN BODY BUILDING PRODUCTS,
LLC, an Illinois Limited Liability Company,

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR ATTORNEY'S FEES

This Cause comes before the Court on Defendant's Motion for an Award of Attorney's Fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a). This case came before the Court for final disposition during a non-jury trial in West Palm Beach, Florida, from January 8, 2007, through January 12, 2007. The Plaintiff, Vital Pharmaceuticals, Inc. ("VPX"), filed this action against Defendant, American Body Building Products ("ABB"), seeking an injunction and monetary damages for alleged violations of the Lanham Act, 15 U.S.C. §1125(a), and unfair competition pursuant to Florida common law.

After a five day trial, I found in favor of the Defendant on all claims in the Plaintiff's complaint (DE 139), reserving my ruling on the Defendant's fee request. ABB now seeks an award of fees under the Lanham Act, arguing that this case represented an "exceptional circumstance" where a court may award attorney's fees to the prevailing party.

1

## I. Legal Analysis

Section 35(a) of the Lanham Act states that "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 USCS § 1117(a). The statute does not define what exceptional circumstances are, nor does it provide specific guidance to a court as to what standard to employ in determining a fee award.

In interpreting the language and legislative history of § 1117(a), courts have found that Congress had two classes of litigants in mind when it enacted the fee provision of section 35. First, the legislature envisioned "make whole" compensation for certain victims of infringement; second, Congress endeavored to afford protection to defendants "against unfounded suits brought by trademark owners for harassment and the like." *See Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 771 F.2d 521, 524 (D.C. Cir. 1985), quoting S. REP. NO. 1400, 93d Cong., 2d Sess. 5, 6 (1974).

The Eleventh Circuit has not recently addressed what qualifies as an "exceptional circumstance" under the statute. In *Safeway Stores Inc. v. Safeway Discount Drugs, Inc.,* the Eleventh Circuit held that "An award of attorneys' fees is at the discretion of the lower court, and should be made only in exceptional circumstances and on evidence of fraud or bad faith." 675 F.2d 1160, 1169 (11th Cir. 1982), *citing John R. Thompson v. Holloway*, 366 F.2d 108, 116 (5th Cir. 1966); *Salton, Inc. v. Cornwall*, 477 F. Supp. 975, 992 (D.N.J.1979).

However, the Fifth Circuit's opinion in *John R. Thompson* came before the enactment of § 1117(a), and stated only that "We find no evidence in the record and no such exceptional circumstances as would justify defendants' recovering their attorney's fees from the plaintiff." *John R. Thompson*, 366 F.2d at 116. The court did not define what exceptional circumstances

2

were, nor did it specifically refer to "fraud" or "bad faith." *See Id.*  It appears that the court was simply describing the well-known exception to the American Rule, where a court may award fees to a bad faith or vexatious litigant.  *John R. Thompson*, therefore, does not seem to stand for the proposition that fraud or bad faith is required for a finding of exceptional circumstances.

The Eleventh Circuit returned to this issue, but did not decide it, in the case of *Lipscher v. LRP Publications, Inc.,* 266 F.3d 1305 (11th Cir. 2001).  Here the court noted the variation among the various circuits as to what qualifies as "exceptional circumstances."  While the court relied on *Safeway*, it explicitly chose not to endorse the continued validity of that case.

> While some circuits require an unqualified showing of bad faith, irrespective of which party prevails, other circuits have allowed prevailing defendants to recover Lanham Act fees upon a showing of "something less than bad faith." We believe that under Safeway, the correct standard in the Eleventh Circuit is fraud or bad faith. However, given the district court's express findings, LRP's claim would fail, even under the more lenient standard. We therefore leave the determination as to the continued validity of Safeway to another case.

*Lipscher,* 266 F.3d at 1320 (internal citations omitted).

 The fact that the plaintiff's actions in that case did not even rise to the level of something less than bad faith meant that the Eleventh Circuit had no reason to re-evaluate the *Safeway* standard.  I believe that were the Eleventh Circuit to squarely address the issue today, it would hold that something less than "fraud" or "bad faith" may qualify as "exceptional circumstances" for awarding a prevailing defendant fees under § 1117(a).

The *Noxell Corp*. case is very persuasive on this issue.  There a panel including now Justice Scalia held that fraud or bad faith was not a prerequisite to a finding of exceptional circumstances and an award of attorney's fees to a defendant.

> We think it fair to assume that Congress did not intend rigidly to limit recovery of fees by a defendant to the rare case in which a court finds that the plaintiff "acted in bad faith, vexatiously, wantonly, or for oppressive reasons"; that exception to the "American rule," the Supreme Court has clarified, is always available unless Congress expressly forbids its operation. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258-59, 44 L. Ed. 2d 141, 95 S. Ct. 1612 (1975). Something less than "bad faith," we believe, suffices to mark a case as "exceptional."

*Noxell Corp.,* 771 F.2d at 526.

The court went on to state that

> In our judgment, when Congress "limit[ed] attorney fees to 'exceptional case' and [placed] the award of attorney fees . . . within the discretion of the court," S. REP. NO. 1400, 93d Cong., 2d Sess. 5 (1974), the legislature did not intend to harness judges to a "hardly ever" rule. Instead .... we think "exceptional," as Congress used the word in section 35 of the Lanham Act, is most reasonably read to mean what the word is generally understood to indicate -- uncommon, not run-of-the-mine.[sic]

*Id.*

This reasoning is persuasive because a "bad faith" standard is little more than an enunciation of the "bad faith/vexatious litigant" exception to the American Rule. Nothing in the language of the Lanham Act serves to eliminate a judge's discretion under the exception to the American Rule. Indeed, the Eleventh Circuit has already recognized that a "bad faith" exception to the American Rule always exists.

> Under the inherent power of the court to supervise and control its own proceedings, an exception to the American Rule has evolved which permits the court to award a reasonable attorneys' fee to the prevailing party when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons.

*Pedraza v. United Guar. Corp.*, 313 F.3d 1323, 1336 (11th Cir. 2002) (internal citations

omitted).

Given that a "bad faith" exception already exists, it would be illogical for Congress to add the "exceptional circumstances" provision to the statute, if that was merely a redundant statement of the American Rule exception. Such a construction would make the exceptional circumstances language of the statute mere surplusage. It seems, given the American rule exception, that "exceptional circumstances" must mean something less than "bad faith."

Other circuits agree that bad faith is not a prerequisite to a finding of exceptional circumstances and an award of fees. The Seventh Circuit has described the standard for awarding fees as follows:

> It would not do justice to the statutory word "exceptional" (not found in the Copyright Act's attorneys' fee provision, incidentally) to say that any time a plaintiff loses, the district court can award attorneys' fees to the defendant merely because the plaintiff acted deliberately, albeit in perfect good faith, in bringing the suit. But between good faith as a safe harbor and deliberateness as an automatic basis for awarding fees is the category of oppressive suits, fairly described as exceptional, in which the case for an award of fees to the defendant is compelling.
>
> [A] suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying merely to extract a settlement based on the suit's nuisance value.

*Door Sys. v. Pro-Line Door Sys.*, 126 F.3d 1028, 1032 (7th Cir. 1997).

The Fourth Circuit has also held that a prevailing defendant does not need to prove bad faith on the plaintiff's part in order to recover fees under § 1117(a).

> Like the Noxell court, we believe that a finding of bad faith on the part of a plaintiff is not necessary for a prevailing defendant to prove an "exceptional" case under section 35(a) of the Lanham Act.

*Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 599 (4th Cir. 1992).

In reaching this conclusion, the Fourth Circuit noted that recovery of attorney's fees was the only remedy available to a defendant faced with a meritless action, while a plaintiff has the remedy of attorney's fees, compensatory and treble damages.  *See Id.*

A court's use of a "bad faith" standard for exceptional circumstances is inadequate to protect defendants from claims that, while having a faint color of legal sufficiency, are essentially anti-competitive tools.  While bad faith may suffice as a standard for prevailing plaintiffs, who already have the remedies described above, it is an excessively high bar for prevailing defendants who have no other remedy. Some courts have bifurcated a standard for analyzing "exceptional circumstances," with a distinct test for both prevailing plaintiffs and defendants.[1]

Even if a court chose not to bifurcate a standard and instead utilized a party neutral approach, nothing in the statute mandates that a district court limit itself in the examination of what may constitute "exceptional circumstances."[2]  Certain conduct, such as willful

---

[1] The Fourth, Seventh, Eighth, Ninth, Tenth, and District of Columbia Circuits have refused to endorse symmetrical tests for prevailing plaintiffs and defendants; these courts permit district courts to consider the objective merits of the underlying suit as an independent factor. I have already discussed the cases from the Seventh and DC Circuits.  The additional circuit cases are: *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 144 (4th Cir. 2000) (describing an open-ended, multifactor test for determining when prevailing defendants should recover fees); *Hartman v. Hallmark Cards, Inc*., 833 F.2d 117, 123 (8th Cir. 1987) (reasoning that "the absence of bad faith is not alone determinative of the Lanham Act fee issue"); *Boney, Inc. v. Boney Serv.*, Inc., 127 F.3d 821, 827 (9th Cir. 1997) (finding that exceptional circumstances other than bad faith can justify shifting fees in favor of the prevailing defendant); *Nat'l Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143, 1147 (10th Cir. 2000) (describing multifactor test that permits district court to consider objective and subjective reasonableness)

The use of a different standard for plaintiffs and defendants, however, may contradict the Supreme Court's approach in *Fogerty v. Fantasy,* 510 U.S. 517 (1994).  There the Court interpreted a similar fee provision under the Copyright Act and ruled that a party neutral approach, rather than a bifurcated standard, was appropriate.  *See Id.* at 534.

[2] Plaintiff cites to *Dieter v. B & H Indus*., 880 F.2d 322, 329 (11th Cir. 1989) for the statement that "The legislative history indicates that a court should only award attorney fees in cases "characterized as malicious, fraudulent, deliberate and willful." (quoting S.REP. No. 93-1400, 93rd CONG., 2nd SESS., reprinted in 1974 U.S.CODE CONG. & AD.NEWS 7132, 7136.)  This legislative history was in reference to prevailing plaintiffs and the conduct of an infringing defendant that could qualify as exceptional circumstances.  It therefore does not mandate

infringement, would likely qualify as bad faith but would only apply to a defendant. Anti-competitive animus, on the other hand, would only apply to a plaintiff. Indeed, Congress intended that broad principles of equity should guide the award of fees under the statute. Specifically, the Senate report states that the purpose of the fee-shifting provision is to "authorize award of attorney fees to the prevailing party in trademark litigation where justified by equitable considerations." *Te-Ta-Ma Truth Foundation-Family of URI v. World Church of the Creator*, 392 F.3d 248, 260 (7th Cir. 2004), *citing* S. Rep. No. 93-1400 (1974), reprinted in 1974 U.S.C.C.A.N. 7132, 7132.

Regardless of the standard a court employs in analyzing "exceptional circumstances," a district court has broad discretion in determining what actions or conduct meet that standard. While I believe that the Eleventh Circuit would adopt a less than bad faith standard if faced with the question today, such a determination is not relevant to the outcome of this motion. Even if the Eleventh Circuit was to maintain the *Safeway* standard, the facts of this case rise to the level of bad faith and justify a fee award.

Research did not reveal an Eleventh Circuit case that enunciated a standard for determining what constitutes bad faith for a Lanham Act analysis. The Second Circuit's bad faith analysis centers on the plaintiff's motivation in bringing the case and the suit's objective legal merits. *See Mennen Co. v. Gillette Co.,* 565 F. Supp. 648 (S.D.N.Y. 1983), aff'd mem., 742 F.2d 1437 (2d Cir. 1984).

The Eleventh Circuit appeared to accept this standard for determining bad faith in

---

that a plaintiff's conduct be malicious, fraudulent, deliberate and willful to qualify as an exceptional case.

Lanham Act cases in *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332 (11th Cir. 2001). There the court affirmed a ruling of the district court that had awarded fees to the prevailing defendant based upon the plaintiff's improper motivation and the case's lack of merit. *Id.* at 1336. In employing this standard, I find that the Plaintiff's improper motivation, combined with the lack of legal merit to the case, justify a finding of bad faith and a fee award in favor of Defendant.

As a preliminary matter, Plaintiff argues that by prevailing on Defendant's motion for summary judgment, it necessarily follows that a fee award is inappropriate. I disagree. The summary judgment order did not in any way address the merits of the case or the sufficiency of Plaintiff's evidence. Rather, I noted that "[t]he legal inquiry and tests involved in ruling on a trade dress claim are not conducive to resolution at the summary judgment stage, where the Court cannot make factual determinations." *See* Order Denying Summary Judgment at 5. It was the bar against making factual findings, rather than any strength in Plaintiff's case, that prohibited me from granting summary judgment.

Other courts agree that prevailing at the summary judgment stage does not automatically allow a party to escape a fee award. "[T]he fact that plaintiff managed to bring these claims to trial is of little relevance as a general principle. Attorneys' fees have been awarded to a defendant under § 1117(a) after a trial has been completed." *IMAF, S.P.A. v. J.C. Penney Co.*, 810 F. Supp. 96, 99 (S.D.N.Y. 1992); *see also Diamond Supply Co. v. Prudential Paper Products Co.*, 589 F. Supp. 470, 475 (S.D.N.Y. 1984) (attorney's fees awarded after bench trial); *Mennen Co.,* 565 F. Supp. at 657 (attorney's fees awarded after bench trial).

Since the fact that Plaintiff prevailed at the summary judgment stage does not affect

8

Defendant's entitlement to a fee award, I will now analyze the elements constituting bad faith in this case.

Plaintiff herein failed to establish even one of the three elements required to prevail on a Lanham Act claim in the Eleventh Circuit.[3] The features of the Redline bottle that Plaintiff claimed as its protected trade dress were very limited, namely its smooth, cylindrical bottle design and neck with vertical lettering of the product name. This trade dress was not inherently distinctive, and despite the fact that courts have held survey evidence to be the most persuasive in establishing secondary meaning, Plaintiff intentionally chose not to present survey evidence.[4] The only other evidence of secondary meaning that Plaintiff offered was advertising of Redline, some of which did not even feature the claimed trade dress, and the testimony of Hanson and Bukovi, at least one of whom was a personal friend of the Plaintiff's CEO. Simply offering evidence of extensive advertising is inadequate to prove secondary meaning, as the dispositive factor is the effectiveness of that advertising. *See Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 858 (11th Cir. 1983). As stated, Plaintiff offered no evidence demonstrating the effectiveness of its advertising on the minds of consumers except for the testimony of the two aforementioned witnesses, whose bias was evident.

Additionally, the unconvincing trial testimony of the Plaintiff's CEO, Mr. Owoc, confirmed my belief that this case was commenced in bad faith for an anticompetitive purpose.

---

[3] Plaintiff must prove by a preponderance of the evidence that (1) the trade dress of the two products is confusingly similar; (2) that the features of the trade dress are primarily nonfunctional; and (3) that the trade dress is inherently distinctive or has acquired secondary meaning. *See Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996).

[4] *See Sugar Busters LLC v. Brennan,* 177 F.3d 258 (5th Cir. 1999). I am not holding that survey evidence is required to prove secondary meaning. Rather, in the absence of survey evidence, a Plaintiff must have other compelling evidence proving secondary meaning, none of which appeared in this case.

Aside from a general evasiveness in responding to questions from Defendant's counsel, Owoc made various statements completely lacking in credibility or evidentiary support. When shown a concept drawing of various bottle designs made by CCL Container, Owoc told defense counsel that it was a falsified document, and that CCL is known to falsify documents. When I asked the witness what his basis was for making that claim, he responded that he had never seen that document before, so it must have been falsified. *See* Owoc Trial Testimony at 18-20. This statement was made despite the fact that the Plaintiff's attorneys had stipulated to the authenticity of the documents at issue.

Plaintiff's case also suffered from serious credibility problems in its effort to prove that the Redline bottle was unique and its own design. Mr. Owoc and Mr. Gonzalez testified that VPX came up with the bottle design that became the Redline bottle. At trial Mr. Owoc stated that the shape of the Redline bottle "never existed prior to Alex and I designing the bottle, as Alex testified." Owoc Trial Testimony at p. 9. In addition, Plaintiff's complaint stated that "VPX substantially participated with CCL in the design of packaging for its new product," and "after months of work, VPX's substantial design efforts resulted in a unique and inherently distinctive packaging." *See* Pl. Complaint, ¶17,18. At trial, however, there was no credible evidence of any "substantial participation" by VPX in the design of a new bottle shape. Although Owoc attempted to argue that the bottle design did not exist before his company designed it, his statement lacked any support. Evidence at trial revealed that CCL had pre-existing designs for an aluminum bottle virtually identical to what became Redline as early as August of 2003, at least two months before VPX even contacted CCL to discuss potential bottle designs. *See* Owoc Trial Testimony at 35-38.

Various representatives of bottle-maker CCL Container stated that the Redline bottle was a standard, 8 ounce, stock aluminum bottle that CCL marketed and sold to various companies prior to VPX's use of it for Redline. VPX simply overlayed its graphics onto the standard CCL bottle, as this also allowed it to avoid any additional costs for tooling that would have been required for a new, unique bottle design.[5] The claims that VPX somehow created the design and concept for the Redline bottle were simply not credible. Plaintiff's attempts to prove that it designed a new and unique bottle for Redline, when all evidence revealed the opposite to be true, is evidence of bad faith.

Plaintiff's claim that its trade dress was primarily non-functional also had no merit. One of the central features of the claimed trade dress, vertical lettering, was an unquestionably functional feature. As I noted in the Order of Final Disposition, a competitive disadvantage would result if Plaintiff was the only RTD supplement maker allowed to employ vertical lettering on an 8 ounce bottle. Furthermore, Plaintiff was not even the first producer to employ vertical lettering on a bottle in the sports supplement market.

Plaintiff pursued the claim that its limited trade dress was primarily non-functional in the face of cases in this district such as *Carillon Importers v. Frank Pesce Group,* 913 F. Supp. 1559 (S.D. Fla. 1996). The relevant portion of the case is as follows:

---

[5]Mr. Goda, CCL's vice president of new product and market development, stated that VPX was interested in its standard 8 ounce bottle design because there would be no additional costs for tooling. ("[VPX] wanted something that [VPX] didn't have to invest tooling in. That's why you see the Trimlines and the ovals. They were standard tool packages for us. So if he would choose something that we already had available, then they could basically enter the market without paying tooling charges for something special").
Mr. Spohr, a CCL marketing director and sales manager, described the bottle used by VPX as a standard container available to anyone who might request it for use in holding a beverage or other liquid product. CCL would not have been willing to enter into an exclusive arrangement with one manufacturer for use of its 8 ounce bottle, as it had already offered the product to so many other companies. (Spohr: "this is a general specification for containers manufactured available for sale to any prospect").

> In the Eleventh Circuit, a bottle with a neck on it would probably not constitute protected trade dress because a neck is a functional requirement on a bottle, or at least a competitive necessity. In contrast, a bottle with a swan shaped neck on it would be protectable because of the non-functional whimsy of its neck design. Although, the Stolichnaya Cristall bottle alone is quintessentially functional in its common, wine bottle shape, the combination of elements comprising Stolichnaya Cristall's trade dress is not merely functional. Among all the bottle shapes, labels, and color schemes available to a producer distributor, the selection of a narrow, clear glass, Russian wine bottle, sealed in black neck wrapping and labeled in black with white, gold, and red lettering, is decidedly non-functional.

*Id.* at 1564.

Plaintiff's trade dress, aside from the functional element of vertical lettering, was nothing more than a bottle with a neck on it, a purely functional design. In spite of this obvious problem, Plaintiff actually cited *Carillon* in support of its position. This occurred despite the fact that the case relied on the distinctive labels and color schemes to find a valid trade dress; features that VPX did not claim as part of its own trade dress. Such misplaced reliance is additional evidence that Plaintiff had no legal basis to claim that its limited trade dress was somehow non-functional. Such a limited trade dress does not deserve protection under the Lanham Act, and holding otherwise would lead to anticompetitive results.

VPX claims in its opposition to ABB's motion for fees that it had to utilize a very limited trade dress because the claimed trade dress applied to a family of RTD products, not just Redline. *See* Pl. Opp. at 14. Analyzing this argument reveals how finding such a limited trade dress protectable would lead to absurdly anticompetitive results. VPX states that it cannot claim color or type of graphics as part of its trade dress because its family of RTD products all have different colors and graphics types. *See Id.* (Redline is blue with block lettering; Black Pearl is black with

crackled block lettering; Dietex is white with plain thick, separated block lettering).

Plaintiff asserts that it employed a very limited definition of its trade dress as a means of covering its entire family of RTD products.  However, by not claiming the color as part of the trade dress, but including vertical lettering, VPX essentially sought to prohibit competition.  Finding such a limited trade dress protectable would mean that a competitor could not offer a product in a similarly shaped bottle displaying *any* type of color scheme or *any* type of vertical lettering.  VPX would have had a monopoly over RTD products sold in smooth, cylindrical containers in any color and using any type of graphics displayed vertically.

Finally, Plaintiff attempted to prove that there was a likelihood of confusion between Redline and Speed Shot, despite the fact that their color scheme and graphics were completely different, and despite the fact that ABB placed its eagle emblem trademark in two prominent places on the Speed Shot bottle.  The starkly different appearance of the two products alone should have given the Plaintiff pause in thinking it could prove a likelihood of confusion.

This is supported by the Second Circuit's statement in *Nora Beverages v. Perrier Group*, where the court stated "Labels can be integral, if not dispositive, factors in determining overall similarity of trade dress." 269 F.3d 114, 122 (2d Cir. 2001).  The court went on to state that "the presence of the prominent and distinctive labels alone negates any possibility of a likelihood of confusion and provides sufficient basis for affirming the district court's grant of summary judgment." *Id.* at 123.

Here the only two witnesses Plaintiff offered to prove a likelihood of confusion were Mr. Bukovi and Mr. Hanson, one a close friend and another an admirer of Plaintiff's CEO.  While this fact does not in and of itself discredit their testimony, their own statements revealed that they

were not confused as to Speed Shot's origin upon viewing the eagle emblem. Again, Plaintiff did not offer either a survey or testimony from any unaffiliated, average consumer in the RTD beverage industry as evidence of a likelihood of confusion.

The Plaintiff's motivation in bringing suit seemed to be an effort to utilize the Lanham Act as a tool to stifle legitimate competition, rather than to protect a valid trade dress. This is evidenced by the fact that VPX had an evolving definition of its trade dress throughout the case.

For example, VPX in its complaint herein did not allege the size of the Redline bottle as part of its trade dress. *See* Pl. Complaint ¶18. Mr. Owoc confirmed this fact in his deposition. *See* Owoc Depo, pp.98-99. However, in its response to Defendant's summary judgment motion, VPX began asserting that the 8-ounce bottle size *was* part of its claimed trade dress. *See* Pl. Opp. to ABB's Motion for Summary Judgment, p. 2. Mr. Owoc then testified to this effect during the trial. *See* Owoc Trial Testimony at pp. 5-6.

Despite attempting to claim the size of the Redline bottle as part of its protected trade dress in this case, VPX has sent a cease and desist letter alleging infringement of the Redline trade dress to Bio-Engineered Supplements & Nutrition ("BSN"), a company with an RTD product offered in a 16-ounce bottle. *See* Def. Trial Ex. 207-208. At trial, Mr. Owoc stated that he did not know why his attorneys had sent a cease and desist letter to BSN, in light of the fact that he was claiming the 8-ounce bottle size as part of VPX's trade dress in this case. These tactics reveal that VPX really seeks to use the Lanham Act and the threat of litigation as a weapon to drive other RTD supplement makers out of the market. Rather than engage in a thorough investigation to see if there is a colorable legal claim under the Lanham Act, Plaintiff chooses to immediately threaten potential competitors with costly litigation. Here, when the

available evidence should have made clear to VPX that its claim could not satisfy the Eleventh Circuit's test for Lanham Act claims, it still chose to proceed with a costly trial amidst insufficient evidence. This further constitutes bad faith under the *Safeway* standard, entitling Defendant to an award of attorney's fees against Plaintiff VPX.

**II. Conclusion**

The Eleventh Circuit has not recently addressed the continued validity of the *Safeway* bad faith standard for exceptional circumstances under the Lanham Act's attorney's fee provision. As bad faith is always a basis for a fee award pursuant to the exception to the American Rule, and the fact that *Safeway* relied on precedent that pre-dated the enactment of § 1117(a), I believe that the appellate court would adopt a less than bad faith standard were it to decide on the issue today. However, even if that was not the case, Plaintiff's actions satisfy the bad faith standard under *Safeway* and justify a fee award.

Plaintiff could not satisfy even one of the elements of a valid trade dress claim, and its case suffered from severe credibility problems and a lack of convincing evidence. Its claimed trade dress was very limited and seemed designed to allow the Plaintiff to achieve a monopoly over the sale of RTD products in smooth, cylindrical containers with vertical lettering. As I stated in the Order of Final Disposition, this case appeared as nothing but a thinly-veiled effort to stifle legitimate competition, competition that is legal under the law.

Accordingly, it is

ORDERED AND ADJUDGED that Defendant's Motion for Attorney's Fees pursuant to § 1117(a) is GRANTED. Defendant shall submit a verified motion with the amount of fees sought within ten (10) days of the date of this Order. Plaintiff shall then file a response within

ten (10) days of receipt of Defendant's Motion. Defendant shall then have five (5) days to file a reply.

DONE AND ORDERED in Chambers at West Palm Beach, FL, this 23rd day of February 2007.

_____
DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

copies to counsel of record